**SIGNED this 2nd day of October, 2012**

_____
John C. Cook
UNITED STATES BANKRUPTCY JUDGE

_____

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **Value Investment Properties, LLC** | ) | **No. 11-16395** |
| | ) | **Chapter 11** |
| **Debtor** | ) | |
| | ) | |
| **Richard L. Kinzalow, Trustee of the** | ) | |
| **Richard L. Kinzalow Declaration of Trust** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Adv. No. 11-1174** |
| | ) | |
| **Clayton Bank and Trust,** *et al.* | ) | |

**M E M O R A N D U M**

This adversary proceeding was initiated by plaintiff Richard L. Kinzalow, as trustee of the Richard L. Kinzalow Declaration of Trust, to determine whether his liens in the manufactured homes at issue in this proceeding take priority over the liens held by Clayton Bank and Trust. Having

-1-

considered the evidence presented at trial, together with the arguments and briefs of the parties, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in bankruptcy adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure. This adversary proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(K).

**I.**

Value Investment Properties, LLC, and Riverglen Homes, LLC, are debtors in consolidated chapter 11 cases pending in this court.[1] Value Investment Properties owns a manufactured home park located in Hamilton County, Tennessee, known as Riverglen Community & Home Center. The park is composed of sixty-nine lots or spaces, one of which is occupied by a mini-storage warehouse unit. This debtor offers vacant lots for rent to tenants who own their own mobile or manufactured homes, and also owns manufactured homes in the park that are available for lease or purchase, either for cash or on credit via installment sales contracts. On June 5, 2007, the principals of Value Investment Properties, James E. Vincent, Sr., and James Tague, sold their interests in the company to Michael Krumm. To secure this purchase, Value Investment Properties executed and delivered to Messrs. Vincent and Tague a deed of trust, which granted a security interest in its real property, fixtures, and personal property. The deed of trust was recorded, both as a deed of trust and as a fixture filing under the Uniform Commercial Code as enacted in Tennessee. A financing statement was not filed with the Tennessee Secretary of State, nor was the lien noted on any certificates of title

---

[1] Value Investment Properties filed its petition on November 17, 2011. Riverglen Homes filed its petition on May 21, 2012. The cases were substantively consolidated on May 30, 2012.

to the manufactured homes owned by the company. Subsequently, Messrs. Vincent and Tague assigned the deed of trust to the plaintiff.[2]

On October 6, 2008, Riverglen Homes was formed, and Value Investment Properties conveyed all of its interests in the manufactured homes to Riverglen, which thereafter continued in the same business as Value Investment Properties, namely holding manufactured homes located in Riverglen Community & Home Center for sale or lease. Also in October 2008, Riverglen granted the defendant bank a security interest in both certain manufactured homes owned by Riverglen and contractual rights owned by Riverglen in manufactured homes that had been sold to third-party purchasers. The bank filed a financing statement with the Tennessee Secretary of State to perfect its security interests in the manufactured homes and contractual rights arising from the sale of the homes, and the bank also noted its liens on certificates of title to the manufactured homes.

At trial, evidence was introduced regarding the business operations of Value Investment Properties (and subsequently Riverglen) and the manner of attachment of the manufactured homes to the land in the manufactured home center. Mr. Vincent testified that, at the time Value Investment Properties purchased the home center in 2002, approximately thirty-two homes were located on the real property: nine were owned by Value Investment Properties and available for purchase or rent; and the others were owned by their occupants who paid lot rent to the company. Mr. Vincent testified that he "hoped" that all of the manufactured homes would sell because occupants who had an ownership interest in their manufactured homes took better care of the homes, and the installment

---

[2]Hereafter, the court will use "plaintiff" to refer both to the plaintiff and to his predecessors in interest.

contracts were very lucrative for Value Investment Properties. In fact, payments on the installment contracts were necessary for the company's cash flow.

In addition to buying a manufactured home, a purchaser also had the option of purchasing other items, including decks/porches, underpinning, and external central air compressors. A purchaser under an installment contract did not, however, purchase the land upon which the home was located, but rented the lot on which the home was installed. The installment contract provided that a purchaser would be given title to the manufactured home free of encumbrances within thirty days of the final installment payment. The contract also restricted movement of the manufactured home until the contract had been fully performed. A purchaser could seek outside refinancing for a manufactured home and, once the buyer paid for the home from the refinancing proceeds, the seller would deliver clear title. Although not controlling, Mr. Vincent testified that he considered the purchaser under an installment contract to be the owner of the manufactured home at the time of signing, with the debtor retaining merely a security interest. According to the installment contracts introduced into evidence, a used, single-wide manufactured home had a sales price of approximately $30,000.00.

During the ownership of Value Investment Properties by Mr. Vincent and Mr. Tague, approximately fifteen manufactured homes were purchased and placed in the home center. The company purchased those homes via floorplan financing. By 2007, when Mr. Krumm purchased Value Investment Properties, approximately fourteen of the company-owned homes had been sold or were under an installment contract. Mr. Vincent testified that he assumed Mr. Krumm would continue the business of Value Investment Properties as usual, which included the sale of manufactured homes under installment sales contracts. Since the sale of ownership of the company to Mr. Krumm, Value Investment Properties and Riverglen have acquired and sold approximately fifty

manufactured homes under installment contracts. Presently, all thirty-seven of the homes located in the home center in which the debtors claim interests are occupied and under contract. Ten lots in the home center are currently vacant, and the remaining twenty-two lots are occupied by tenants renting lots.

According to the testimony of Mr. Vincent, the manufactured homes were required by state law to be installed in a certain manner, and all homes – whether owned by one of the debtors or by the residents – were attached to the realty in essentially the same way to comply with state law. Michael Jenkins, a manufactured home installer, testified that the homes could be moved with three to five hours of labor, depending on the home size. The cost of removing a manufactured home and reinstalling it at a new location would be between $2,700.00-$3,000.00 for a single-wide home and $5,000.00-$7,000.00 for a double-wide home. Mr. Jenkins also testified that, assuming the lot met state code standards, once a manufactured home was removed from the home center, another home could be installed on that lot. Sherry Presley, on-site manager of the home center and partial owner of Value Investment Properties, testified that at least two manufactured homes have been removed from the home center. Further, according to Ms. Presley, only three of the sites do not meet state standards, as they are not connected to utilities.

The parties have conceded that the manufactured homes at issue fall within the definition of "manufactured home" set forth in section 55-1-105(1)[3] of the Tennessee Code Annotated. Additionally, pictures of the homes admitted into evidence during the trial confirmed that the homes were larger than 320 square feet and were constructed on a permanent chassis. No certificates of title to

---

[3] All citations to the Tennessee Code Annotated are to the version in effect on June 5, 2007.

the manufactured homes were ever surrendered pursuant to section 55-3-138 of the Tennessee Code Annotated.

## II.

Under Tennessee law, the character of the property at the time the security interest attaches determines the proper method of perfection. *Roberts v. Green Tree Fin. Corp.*, 197 B.R. 846, 850 (Bankr. E.D. Tenn. 1996). The plaintiff argues that the manufactured homes had become fixtures to the real estate at the time the deed of trust was executed, so the proper method of perfection was a fixture filing with the register of deeds. The bank argues that the manufactured homes were not fixtures at the time the deed of trust was executed, but rather the manufactured homes were inventory within the meaning of the Uniform Commercial Code as enacted in Tennessee, and a lien in inventory could only be perfected by filing a financing statement with the Tennessee Secretary of State. In the alternative, the bank argues that the manufactured homes were subject to the Tennessee Motor Vehicle Title and Registration Law, Tenn. Code Ann. §§ 55-1-101 - 55-6-110, under which notation on the certificate of title is the exclusive method for perfecting a lien on a manufactured home.

Because the only issue in this adversary proceeding is the relative priority of the parties' liens in the collateral, the court must decide which creditor perfected its security interest and, if both perfected, which one was the earliest to do so. Considering the method of perfection each party utilized in this case, the bank will automatically prevail if the manufactured homes at issue were not fixtures under Tennessee law at the time the deed of trust and fixture filing were executed or anytime before the bank's security interests attached. Hence, the court need only determine whether the

manufactured homes were fixtures at the time the deed of trust was executed or became fixtures at any time prior to the attachment of the bank's security interests.

It is the plaintiff's contention that the Tennessee common law of fixtures governs whether the manufactured homes became so attached to the real property that a right arose in them under real property law at the time the deed of trust was executed. In support of this position, the plaintiff relies on the cases of *Rose v. Russell*, No. 89-303-II, 1990 WL 51822 (Tenn. Ct. App. Apr. 27, 1990), and *Associates Capital Corp. v. Cookeville Production Credit Association*, 569 S.W.2d 474 (Tenn. Ct. App. 1978).[4] Indeed, those two cases and prior decisions of this court regarding the attachment of mobile homes do apply the common law of fixtures. In 2003, however, the Tennessee legislature extensively revised the Tennessee Motor Vehicle Title and Registration Law to address manufactured homes specifically. Those revisions, which include the addition of a definition of "manufactured home," Tenn. Code Ann. § 55-1-105(1), and a mechanism by which a certificate of title for a manufactured home may be surrendered, *id.* § 55-3-138, suggest that the legislature intended to define the exclusive manner in which a manufactured home may become a fixture in derogation of the common law of Tennessee.[5] If so, the manufactured homes at issue in this proceeding would not

---

[4]The court has previously relied upon those cases in a number of disputes regarding mobile homes. *See In re Northern*, 294 B.R. 821 (Bankr. E.D. Tenn. 2003); *Roberts v. Green Tree Fin. Corp.*, 197 B.R. 846 (Bankr. E.D. Tenn. 1996); *In re Miller*, 63 B.R. 566 (Bankr. E.D. Tenn. 1986); *see also In re Owens*, 36 B.R. 661 (Bankr. M.D. Tenn. 1984). In *Associates Capital* and *Rose*, the court relied upon the definition of "mobile home," which required that the mobile home be "designed for travel upon the public highways." Tenn. Code Ann. § 55-1-105(2). In 2003, the legislature added the definition of "manufactured home," which does not contain a similar phrase.

[5]Courts in other states have held that similar laws effectively abrogated the common law regarding fixtures. Those courts have held that compliance with statutory mechanisms allowing the owner to surrender the title to a manufactured home is the exclusive method by which rights to a manufactured home can arise under real property law. *Morris v. ABN Amro Mortg. Group, Inc.*, No.
(continued...)

constitute fixtures because there was no compliance with the procedures prescribed by section 55-3-138. However, the court need not address that issue because, even applying the common law of fixtures to the manufactured homes in this case, the debtors' manufactured homes would still be personal property and not fixtures.

The Tennessee Supreme Court has explained the common law of fixtures as follows:

> In Tennessee, only those chattels are fixtures which are so attached to the freehold that, from the intention of the parties and the uses to which they are put, they are presumed to be permanently annexed, or a removal thereof would cause serious injury to the freehold. The usual test is said to be the intention with which a chattel is connected with realty. If it is intended to be removable at the pleasure of the owner, it is not a fixture.

*Hickman v. Booth*, 173 S.W. 438, 438 (Tenn. 1915) (citations omitted); *accord*, *Memphis Hous. Auth. v. Memphis Steam Laundry-Cleaner, Inc.*, 463 S.W.2d 677, 679 (Tenn. 1971); *Harry J. Whelchel Co. v. King*, 610 S.W.2d 710, 713-714 (Tenn. 1980); *Rose v. Russell*, No. 89-303-II, 1990 WL 51822, at *5-6 (Tenn. Ct. App. Apr. 27, 1990). Of those factors, intent and purpose are controlling. *In re Northern*, 294 B.R. 821, 829 (Bankr. E.D. Tenn. 2003). "[T]he tendency of modern decisions is to make the rights of the parties to fixtures and buildings depend not on the manner in which they are affixed to the freehold, but upon the character of the parties, the intention in erecting the improvements, and the uses to which they are put." *Memphis Hous. Auth. v. Memphis Steam Laundry-Cleaner, Inc.*, 463 S.W.2d at 679 (quoting *Cannon v. Hare*, 1 Tenn. Ch. 22 (1872)).

---

⁵(...continued)
03-5195, 2005 Bankr. LEXIS 1331, at *18-22 (Bankr. D. Kan. June 22, 2005); *Roost v. Green Tree Fin. Servicing Corp.*, 227 B.R. 548, 551-552 (Bankr. D. Or. 1998); *Beneficial Consumer Disc. Co. v. Gerard*, 70 B.R. 505, 508 (Bankr. W.D. Pa. 1987); *Green Tree - AL LLC v. Dominion Res., L.L.C.*, No. 2100187, 2011 WL 3963010, at *8 (Ala. Civ. App. Sept. 9, 2011); *Leader Fed. Bank for Sav. v. Saunders*, 929 P.2d 1343, 1351-1353 (Colo. 1997); *Citizens Nat'l Bank v. Wash. Mut. Bank*, 309 S.W.3d 792, 796 (Ky. Ct. App. 2010); *W.H.V., Inc. v. Assocs. Hous. Fin., LLC*, 43 S.W.3d 83, 89-93 (Tex. Ct. App. 2001).

In this case, Mr. Vincent testified that every home owned by Value Investment Properties could be purchased and that he hoped every home would sell. The installment sales contract governing the purchase of a manufactured home gave a purchaser the right to remove the home upon completion of payments. Mr. Vincent testified that he assumed Mr. Krumm would continue to operate the debtor in the same manner, which included the sale of manufactured homes under installment sales contracts. Since the transfer of ownership of Value Investment Properties to Mr. Krumm, the debtors have acquired and sold approximately fifty manufactured homes under installment contracts. Currently, every manufactured home in which the debtors claim an interest is under an installment sales contract. The debtors' business operations, the contracts evidencing those operations, and the subjective intent of their principals make it clear that the debtors did not intend for any of the manufactured homes to be permanently affixed to the realty of the home center.

Further, the method of attachment of the homes to the real estate does not negate that intent. The attachment of manufactured homes to realty for the purpose of occupancy is regulated by the state. The method of attachment is not, therefore, an objective indication of the parties' intent. The homes were attached to the realty in the same manner as homes owned by tenants renting lots from the debtors. The purchasers of the manufactured home did not purchase any of the real estate of the home center. A home could be removed with three to five hours of labor, depending on the size of the home.

The removal of a manufactured home was also economically feasible. Based on the installment sales contracts admitted into evidence, a single-wide, used manufactured home was being purchased for approximately $30,000. The cost to move such a home is only $2,700- $3,000 – approxi-

mately one-tenth of the purchase price. It would be cheaper to move a manufactured home than to purchase a new one.

Finally, there was no evidence that removal of any of the manufactured homes would cause substantial harm to the freehold. The removal of a home from the park would cause little to no damage to the home center. A licensed manufactured home installer testified that, assuming the lot was up to state code, nothing would prevent the placement of another manufactured home on a recently vacant lot. Evidence indicates that only three of the lots are not up to state standards, because they are not connected to utilities.

The court finds, therefore, that the debtors' manufactured homes were not fixtures and so the recording of a fixture filing with the Hamilton County Register of Deeds did not perfect the plaintiff's interests in the homes. Rather, the manufactured homes constituted personal property, falling within the Uniform Commercial Code's definition of inventory, Tenn. Code Ann. § 47-9-102(48),[6] and the proper method of perfecting a security interest in inventory in Tennessee is to file a UCC financing statement with the office of the secretary of state, *id.* §§ 47-9-310(a), (b)(3), 47-9-311(a)(2)(A), (d), 47-9-501(a)(2). In the pleading and proceedings before this court, the parties have identified only the manufactured homes as the collateral subject to competing interests. Because the manufactured homes have been sold in the ordinary course of the debtors' business, the nature of the collateral may have been converted from manufactured homes to contractual rights to payment under the installment sales contracts. *Id.* §§ 47-1-201(38), 47-2-401, 47-9-320. Nonetheless, what-

---

[6]The manufactured homes are "inventory" because the debtors are "persons," Tenn. Code Ann. § 47-1-201(30), there is no question that manufactured homes were leased by the debtors as lessors or held by the debtors for sale or lease, and the debtors are clearly in the business of selling manufactured homes.

ever the form of the personal property collateral, the bank was the only party to file a financing statement with the Tennessee Secretary of State. Therefore, the bank was the only party to perfect its security interest in the manufactured homes and the contractual rights that arose from the sale of the homes.

### III.

For the above reasons, the court concludes that Clayton Bank and Trust's interests in the collateral are superior to those held by Richard L. Kinzalow as trustee. The court will enter a separate declaratory judgment to that effect.

# # #